## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: IDREAMSKY TECHNOLOGY LIMITED SECURITIES LITIGATION | Civ. Action No. : 15-cv-2514 (JPO) <br><br> JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Melvyn Boey Kum Hoong ("Hoong") and named plaintiffs Jets Holdings, LLC, ("Jets"), Masoud Shemirani ("Shemirani"), Michael Rubin ("Rubin,"), and Roger Mariani ("Mariani," and together with Hoong, Jets, Shemirani, and Rubin, "Plaintiffs"), by and through their counsel, individually and on behalf of all others similarly situated, for this Consolidated Class Action Complaint against defendants iDreamSky Technology Limited ("IDS" or "Company"), Michael Xiangyu Chen ("Chen"), Jun Zou ("Zou"), Anfernee Song Guan ("Guan"), Jeffrey Lyndon Ko ("Ko"), Erhai Liu ("Liu"), Steven Xiaoyi Ma ("Ma"), Mingyao Wang ("Wang"), David Yuan ("Yuan"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), J.P. Morgan Securities LLC ("J.P. Morgan"), Stifel, Nicolaus & Co., Inc. ("Stifel Nicolaus"), and Piper Jaffray & Co. ("Piper Jaffray," and together with IDS, Chen, Zou, Guan, Ko, Liu, Ma, Wang, Yuan, Credit Suisse, J.P. Morgan, and Stifel Nicolaus, "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their counsel, including, among other things, conversations with witnesses, a review of the Defendants' public documents, conference calls and public announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases, analysts' reports and advisories about the Company, and

information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired IDS American Depositary Shares ("ADSs"): (1) pursuant and/or traceable to the Company's Registration Statement and/or Prospectus issued in connection with the Company's initial public offering on or about August 7, 2014 (the "IPO" or the "Offering"); and/or (2) on the open market between August 7, 2014 and March 13, 2015, inclusive (the "Class Period"). Plaintiffs seek to pursue remedies under the Securities Act of 1933 (the "Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      IDS is purportedly the largest independent mobile game publishing platform in China, based on the number of active users in 2013. International mobile game developers license source codes of their games, purportedly allowing for greater control and efficiency in redesigning their games for the Chinese market. The Company prepares these games and distributes them through its proprietary distribution channels and third-party channels in China. The Company also operates games as a service, where it offers live game services and gains user insights through its multi-dimensional data analysis engine to drive ongoing game optimization and monetization.

3.      On August 7, 2014, IDS priced its IPO of 7,700,000 ADSs, exclusive of the underwriters' exercise of their over-allotment option to purchase 1,155,000 additional ADSs, at $15 per ADS, each ADS representing four Class A ordinary shares of the Company.

4.      In an August 7, 2014 interview in connection with the Company's IPO, Defendant Zou stated that later in 2014, the Company expected to release a popular South Korean game for

mobile devices, known as "Cookie Run." The Company had attached considerable importance to the introduction of Cookie Run to the domestic Chinese market, establishing a special, in-house development team.

5.    By August 7, 2014, however, the Company had fallen far behind schedule in its efforts to launch Cookie Run for the Chinese market, putting its launch in 2014, as the Company had promised, in material doubt. The Company's later-than-expected receipt of the game's source codes and an extension of the testing period for the distribution platform delayed the game's launch. Additionally, negotiations with the game's South Korean developer had reached an impasse, creating additional delays. By early August, 2014, the Company knew that it was about to miss its initial target date for the game's launch, the second half of 2014.

6.    In the IPO Registration Statement and Prospectus IDS filed with the SEC, Defendants failed to alert the market to the delay it had experienced in obtaining the source codes for Cookie Run from the Korean game developer, and it remained publicly silent about this specific issue, as well as about Cookie Run's development generally, through the end of 2014.

7.    In a November 25, 2014 press release, instead of conceding that as of that date, Cookie Run was not ready for launch and that it was highly unlikely to add materially to IDS's fourth quarter 2014 revenues, the Company and the Officer Defendants incorporated material anticipated revenues from Cookie Run into its financial forecast for 2014 and its fourth quarter. In the November 25, 2014 press release, the Company stated that revenues for the fourth quarter of 2014, which was to conclude in just five weeks, were expected to be in the range of US$63.2 million to US$66.5 million.

8.    The Company remained silent about the launch of Cookie Run until March 13, 2015, when it announced that it was lowering its revenue guidance for the fourth quarter of 2014

to between US$52.7 million and $53.0 million, as compared to the previously announced revenue guidance of between US$63.2 million and US$66.5 million.  The Company attributed the changes to the revised guidance "mainly" to two developments, one of which was "the launch of a popular casual game was delayed on one of the Company distribution platforms."

9.      On this news, ADSs of IDS declined $3.60 per share, or over 33%, to close on March 16, 2015 at $7.22 per share, on unusually heavy trading volume.

10.     On March 23, 2015, the Company held an earnings conference call ("March 23 Call") for investors to discuss its fourth quarter and full year, 2014, earnings.  During the call, the Officer Defendants blamed "three key reasons" for the "shortfall on guidance,"  including that "the launch of Cookie Run was delayed due to the company receiving the source code of the game later than was scheduled and the testing period by the distribution platform was extended."  The Company informed investors to "rest assured" that it expected to launch Cookie Run "in 2015," indicating that even three months after including revenues from Cookie Run in its 2014 forecast, it had yet to launch the game.

11.     During the Class Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, in announcing their guidance for the fourth quarter of 2014, Defendants made false and misleading statements, knowing that it was virtually impossible for Cookie Run to launch and contribute materially to the Company's revenues in 2014.  Nor did they caution meaningfully about the debilitating delays in the launch of Cookie Run and the adverse impact on the Company's financial results. Defendants' failure to disclose these specific risks rendered inadequate the Company's general risk disclosures stated in the Registration Statement and Prospectus and the November 25, 2014 press release filed with the SEC.

12.     As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240. 10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.     Lead Plaintiff Melvyn Boey Kum Hoong, as set forth in the accompanying certification, incorporated by reference herein and attached hereto as Exhibit A, purchased IDS ADSs during the Class Period, both on the open market and pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a

result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Named Plaintiff Jets Holdings, LLC, by its principal Mark Miles, as set forth in the accompanying certification, incorporated by reference herein and attached hereto as Exhibit B, purchased IDS ADSs during the Class Period, both on the open market and pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein

19.     Plaintiff Masoud Shemirani, as set forth in the accompanying certification, incorporated by reference herein and attached hereto as Exhibit C, purchased IDS ADSs during the Class Period, both on the open market and pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Plaintiff Michael Rubin, as set forth in the accompanying certification, incorporated by reference herein and attached hereto as Exhibit D, purchased from, among others, Defendant Stifel Nicolaus, IDS ADSs during the Class Period, both pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Plaintiff Roger Mariani, as set forth in the accompanying certification, incorporated by reference herein and attached hereto as Exhibit E, purchased IDS ADSs during the Class Period, both pursuant and/or traceable to the Registration Statement and Prospectus issued in connection

with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant IDS is a China corporation with its principal executive offices located at 16/F, A3 Building, Kexing Science Park, 15 Keyuan Road North, Nanshan District, Shenzhen, Guangdong, 518057, People's Republic of China.  IDS's ADSs trade on the NASDAQ under the ticker symbol "DSKY."

23.     The "Officer Defendants" are:

a.     Defendant Chen was, at all relevant times, Chief Executive Officer ("CEO") and a director of IDS; and

b.     Defendant Zou was, at all relevant times, Chief Financial Officer ("CFO") of IDS.

24.     Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of IDS's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Officer Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Officer Defendants

25.     The "Director Defendants" are:

    a.      Defendant Guan was, at all relevant times, a director of IDS and signed or authorized the signing of the Company's Registration Statement filed with the SEC;

    b.      Defendant Ko was, at all relevant times, a director of IDS and signed or authorized the signing of the Company's Registration Statement filed with the SEC;

    c.      Defendant Liu was, at all relevant times, a director of IDS and signed or authorized the signing of the Company's Registration Statement filed with the SEC;

    d.      Defendant Ma was, at all relevant times, a director of IDS, and signed or authorized the signing of the Company's Registration Statement filed with the SEC;

    e.      Defendant Wang was, at all relevant times, a director of IDS, and signed or authorized the signing of the Company's Registration Statement filed with the SEC; and

    f.      Defendant Yuan was, at all relevant times, a director of IDS and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.     The "Underwriter Defendants" are:

    a.      Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter and joint book-running manager of the Company's IPO.   In

the Offering, Credit Suisse agreed to purchase 3,272,500 ADSs of the Company, exclusive of the over-allotment option;

b.      Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter and joint book-running manager of the Company's IPO. In the Offering, J.P. Morgan agreed to purchase 3,272,500 ADSs of the Company, exclusive of the over-allotment option;

c.      Defendant Stifel, Nicolaus & Company, Inc. ("Stifel Nicolaus") served as an underwriter and joint book-running manager of the Company's IPO. In the Offering, Stifel Nicolaus agreed to purchase 770,000 ADSs of the Company, exclusive of the over-allotment option; and

d.      Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter and joint book-running manager of the Company's IPO. In the Offering, Piper Jaffray agreed to purchase 385,000 ADSs of the Company, exclusive of the over-allotment option.

## SUBSTANTIVE ALLEGATIONS

*Background*

27.      IDS is purportedly the largest independent mobile game publishing platform in China based on the number of active users in 2013, according to Analysys International, an independent market research firm. International mobile game developers grant the Company access to the source codes of their games, purportedly allowing for greater control and efficiency in redesigning their games for the Chinese market. The Company distributes these games through both its proprietary distribution channels and third-party channels, such as app stores and device pre-installations. The Company also operates games as a service, by which the Company offers

live game services and gains user insights through its multi-dimensional data analysis engine to drive ongoing game optimization and monetization.

28.     Over the past approximately three years, there has been an explosion of demand across Asia for video games which are accessible on mobile devices.  In a July 1, 2014 article, Jonathan Cheng ("Cheng") of *The Wall Street Journal* reported on this phenomenon, explaining that "[t]he popularity of games like Cookie Run has brought in a bonanza of revenue for the messaging app makers.  By simply making the game available to play on its mobile platform, companies like WeChat, Kakao and Line skim off a share of money spent by game users."[1]  IDS has positioned itself as a middleman in this market, seeking to modify games developed by companies such as Chinese giant Tencent Holdings Limited or South Korean startup Devsisters Corporation ("Devsisters") into a localized version of the game that can be accessed via various distribution platforms, including mobile messaging apps like WeChat.

29.     Cookie Run is a popular mobile game in which the protagonist is a gingerbread man seeking to escape the flames of an oven.  In two articles published on July 1, 2014 by *The Wall Street Journal*,[2] Cheng details the "runaway success" of Cookie Run in the Asian markets of Japan, Thailand, Taiwan, and South Korea.  Cookie Run, according to Cheng, was South Korea's "most downloaded game" in 2013 and, as of July 2014, was "topping the charts in Japan, Taiwan and Thailand."  The Seoul-based company Devsisters reported that, following its release in April, 2013 on KakaoTalk, Cookie Run had "been downloaded on about half of all South Korean smartphones" and had "racked up 52 million downloads across Asia."  According to Cheng, the

---

[1] *See http://blogs.wsj.com/korearealtime/2014/07/01/for-cookie-run-team-a-taste-of-success/.*
[2] *See http://blogs.wsj.com/korearealtime/2014/07/01/for-cookie-run-team-a-taste-of-success/* and *http://www.wsj.com/articles/how-mobile-games-help-messaging-apps-succeed-1404182365?cb=logged0.9145233056054327.*

success of Cookie Run helped Devsisters generate about US$60 million in 2013 and US$20 million in the first quarter of 2014.  Additionally, Cheng stated that Devsisters' spectacular success has enabled them to "file[] for a $100 million initial public offering slated for [late in 2014] on Seoul's tech-centric Kosdaq index."

30.     According to an October 14, 2014 *whowired.com* article by Jeansun Kim, Cookie Run was considered to be Devsisters' "flagship mobile game."  Cookie Run's remarkable success in South Korea, combined with its popularity in Taiwan and Thailand, led many to conclude that it would "gain popularity in China" upon IDS's releasing it.[3]

31.     In light of the game's track record of widespread success across Asia, the Company determined that it would devote considerable resources to its efforts to localize and distribute Cookie Run in mainland China.  A former IDS employee ("FE1") worked as a game planner for iDreamSky from April 2014 to December 2015.  In that role, FE1 was responsible for planning the development of Cookie Run.  FE1 confirms that the Company viewed its development of Cookie Run as a key business priority.  FE1 recalls that Cookie Run was the most successful Korean game at the time and that, accordingly, the Company attached a great deal of importance to the introduction of the game to the Chinese domestic market.  According to FE1, the Company established a special team in early 2014 to facilitate Cookie Run's development.  This team consisted of four members: a team leader, a game planner (FE1), a game operations specialist, and an assistant.  The Company's commencement of preparations for its redesign and optimization of Cookie Run for release to the Chinese domestic market was made public through the Company's

---

[3] *See http://www.whowired.com/news/articleView.html?idxno=404701.*

issuance of a March 28, 2014 press news release, informing the public that the Company expected to release Cookie Run "in China in the second or the third quarter of this year [2014]."[4]

***The Company's Stalled Negotiations with the Korean Game Developer***

32.     Before the Company could commence efforts to redesign Cookie Run specifically for release to the Chinese domestic market, however, it had to acquire the licenses and source codes required to perform its services.  FE1 recalls that the Company and Devsisters could not reach agreement regarding the preferred game distribution platform.  According to FE1, the Korean game developer insisted that Cookie Run should be distributed only through the WeChat platform.  The Company, however, refused to accept that proposal since, according to FE1, WeChat had released a game in the same game category as Cookie Run.  The Company countered that Cookie Run should instead be distributed through the ShouQ platform to reduce the risk of facing direct competition with WeChat's competing game.

33.     Another former employee of IDS ("FE2") worked as a senior operations manager for iDreamSky from March 2014 to January 2016.  In that role, FE2 was responsible for product publicity, operations planning, market analysis, and the maintenance of promotion distributors.  FE2 reported to iDreamSky vice president Wang Bo and supervised a team of eight operations specialists. FE2 confirms that the rift between the parties regarding the preferred distribution platform delayed the Company's receipt of the source code for Cookie Run.  FE2 recalls that the Company's late receipt of the source code resulted in an extension of the scheduled test period for the distribution platform.

---

[4] *See http://www.idreamsky.com/en/blogs/show/211.*

34.     A third former IDS employee ("FE3") corroborates FE1 and FE2 recalling that, based on FE3's own experience, the delay in receiving the source code for Cookie Run was hardly an uncommon occurrence for the Company. FE3 worked as a mobile games testing engineer for the Company from January 2014 to January 2015. In that role, he was responsible for game operations and bug repairing. FE3 reported to the Company's general testing department manager and worked with three to five engineers, depending on the game's relative level of difficulty. FE3 advises that it was normal for the Company to receive game codes later than expected due to, for example, a divergence in proposed price during negotiations or the existence of technical issues such as game code bugs. FE1 recalls that negotiation failures are quite common for the Company for a variety of reasons, such as distribution disputes, billing disputes, and price divergence. FE2 states that the sort of delay that occurred with respect to Cookie Run happens regularly at the Company.

***The Company's Initial Public Offering***

35.     On August 7, 2014, the SEC declared effective the Form F-1 that IDS filed on July 3, 2014 and repeatedly amended, until on or about August 1, 2014, when the Company filed with the SEC the final Form F-1/A (collectively, the "Registration Statement") and Prospectus for the IPO.

36.     On August 7, 2014, IDS priced its IPO of 7,700,000 ADSs, with each ADS representing four Class A ordinary shares of the Company, at a price of $15.00 per ADS, exclusive of the underwriters' exercise of their over-allotment option to purchase 1,155,000 additional ADSs. According to the Company, the total proceeds to the Company before discretionary incentive fees and expenses was USD $107,415,000 after deducting an estimated USD $8,085,000 underwriting discounts and commissions.

37.     The Company's Registration Statement and Prospectus do not mention Cookie Run at all, and disclose only the general risk that failure to "maintain good and mutually beneficial commercial relationships with our game developer partners" may have adverse financial consequences for the Company.   Moreover, the Registration Statement and Prospectus fail to advise investors of risks associated with breakdowns in negotiations with the Company's game developer partners, including delays in obtaining source codes for the games and the resulting effects that such delays may have on the Company's development and testing periods, as well as the potential impact on the Company's previously announced release dates and accompanying negative financial consequences for the Company.

***Cookie Run's Expected Late 2014 Release***

38.     On August 7, 2014, in connection with the launch of the Company's IPO, *Tech in Asia* published an article authored by Paul Bischoff, in which Defendant Zou stated that "two more games will come to WeChat this year: *Cookie Run* and the long awaited *Fruit Ninja*."[5]

39.     Defendant Zou's reported statement about the expected release of Cookie Run in 2014 also appeared in an article written by Josh Robert Nay and published by *Tru Tower* on August 8, 2014.[6]

40.     The Company thus had conditioned the market in early August, 2014 to expect the release of Cookie Run by the end of 2014.

---

[5] *See https://www.techinasia.com/idreamsky-ipo-beats-expectations-cookie-run-fruit-ninja-hit-wechat-year.*
[6] *See http://www.trutower.com/2014/08/08/fruit-ninja-cookie-run-for-wechat/.*

***Third Party Billing Issue***

41.     The Company processes a substantial amount of revenue through third-party payment channels.   In the Registration Statement and Prospectus, the Company stated the following:

> ***Our ability to monetize our users is subject to third-party payment processing-related risks.*** [7]
>
> We offer our users a variety of payment options, including direct billing through mobile carriers and other third-party online payment platforms. Therefore, we rely on them to provide payment processing services to our users, which subjects us to fraud and other illegal activities in connection with these various payment methods. We generally receive casual game gross billings through the mobile carriers and our mid- and hardcore game gross billings through a few third-party payment channels. The concentration of our payment channels could lead to a short-term disruption in our collection of the gross billings if one or more of them were to narrow or terminate its business cooperation with us, or demand commercial terms that are less favorable to us. Such concentration also makes us more vulnerable to collection risks should one or more of these providers become unable or unwilling to share the proceeds it receives with us. Our operations and business could be harmed if our relationships with one or more of these payment platforms deteriorate, or if one or more of the key payment platforms experience a decrease in their business generally or an increase in non-payment from users.
>
> Furthermore, mobile carriers and third-party payment service providers are entitled to a prescribed percentage of the gross billings charged to our users. If these platforms fail to remit to us the proceeds collected from our user in a timely fashion or at all, if these platforms become unwilling or unable to provide these services to us, or if their service quality deteriorates, our business could be disrupted. Our payment platform partners are also subject to various rules, regulations and requirements, regulatory or otherwise, governing electronic funds transfers and virtual currencies, which could change or be reinterpreted to make it difficult or impossible for them to comply. If our payment partners fail to comply with these rules or requirements, they may be subject to fines and higher transaction fees and lose their ability to accept credit and debit card

---

[7] Unless otherwise noted, all emphasis is in the original text.

payments, process electronic funds transfers or facilitate other types of online payments from our users. This would materially and adversely affect our ability to monetize our users.[8]

42.     FE3 recalls that, before the end of 2014, the Company employed no mature billing platform, leading to frequent technical issues such as disorderly deductions, requiring technical staff to reboot the entire payment system.  During system repairs, FE3 recalls, the Company lost customers.  Only after 2014 did FE3 recall IDS's introducing a mature third-party billing platform, in turn reducing billing issues.

## FALSE AND MISLEADING STATEMENTS

43.     In a section of the Registration Statement and Prospectus,[9] beginning on page 18, entitled "Risks Related to Our Business," the Company stated, among other things, the following:

> ***We work with game developers to provide games to our users. Any loss or deterioration of our relationship with our game developer partners may result in the loss of user base and revenues.***
>
> We work with game developers to publish games on our platform. We have benefited from some of these developers' strong brand recognition and the success of their games in overseas markets. Due to our strong relationship with many of our game developer partners, we are able to obtain the source code of many overseas games, which allows us to play a more substantial role in the games' operation in China. We believe this is crucial to building and expanding our user base and therefore the success of our platform, as well as to our ability to operate and monetize our games.
>
> However, we may not be able to maintain good and mutually beneficial commercial relationships with our game developer partners, including the developers of our most popular games, including Halfbrick Studios Pty. Ltd., or Halfbrick, the developer of Fruit Ninja, Imangi Studios, LLC, the developer of the Temple Run series, and Kiloo ApS, who licenses Subway Surfers to us. Any failure on our part to properly localize or operate or effectively market or monetize their games, safeguard their intellectual property, including the source code of their games, or perform our

---

[8] Registration Statement at 21; Prospectus at 21.
[9] The Director Defendants and the Officer Defendants signed the Registration Statement.

obligations under our agreements with them may cause substantial harm to our business relationships with the game developers. Where we are required to pay an advance royalty or a minimum profit guarantee by the game developer, should the game fail to meet its expected performance targets, we need to compensate the game developer and incur additional loss. Because we are in the process of obtaining certain regulatory approvals and licenses for our publishing business and games, we also may not be in strict compliance with the terms and conditions in some of our distribution agreements with game developers.

The term of our content distribution agreements with game developers is typically one to three years, renewable upon both parties' consent. Our game developer partners may terminate our agreements prior to their expiration voluntarily or as a result of our non-compliance with the terms or conditions, or they may refuse to renew the agreements. Even if they are willing to renew the agreements, they may demand commercial terms, such as revenue-sharing ratios, that are less favorable to us than under our existing agreements. They may choose to partner with our competitors, allowing our competitors to enhance their game portfolio and better compete against us. We began to publish games developed by the subsidiaries of our VIEs in the first quarter of 2014. We cannot assure you that such in-house development capability will not affect our relationship with our game developer partners. Any loss or deterioration of our relationship with any of our game developer partners may result in a loss of revenues and materially and adversely affect our business and results of operations.[10]

44.    Later in the Registration Statement and Prospectus in the same "Risks Related to Our Business" section, the Company made the following statement:

> **If we fail to successfully execute our growth strategy, including our current expansion into new genres of games, the mobile social networking business and game development and acquisition, our future results of operations and growth prospects may be materially and adversely affected.**
>
> We have expanded our product offerings to include games of various genres. To operate games in a new genre, we must identify and obtain licenses for appealing games with high monetization

---

[10] Registration Statement at 19-20; Prospectus at 19-20.

potential from both overseas and domestic game developers. We also depend on these game developers to provide technical support, and to develop updates and expansion packs to sustain user interest and attract new users to our games. We may not be able to successfully establish relationships with high-quality game developers and obtain licenses to their games. Additionally, we have also begun to acquire games under game acquisition agreements. If the games that we acquire fail to become commercially successful, we may not be able to recoup our initial capital investments and receive the expected return, if at all. We have also began to publish games developed by the subsidiaries of our VIEs in the first quarter of 2014. We may need to invest more financial, technical and human resources in connection with developing the games and producing their updates and new editions than we typically do with respect to our licensed games. Expansion into new genres of mobile games or new operation models may present operating and marketing challenges that are different from those that we currently encounter with our existing games. We also face competition from existing players within these markets who may have more experience and resources.

We are also making significant investments in the development and upgrade of SkyNet, which enables our live in-game service, IDS Game Center, which is our mobile application for game services, and www.uu.cc, which is our mobile game information website, all designed to provide social connectivity for our platform, enhance user engagement, promote our brand awareness and create additional monetization opportunities. However, these products may not be effective in achieving these goals and we may not be able to recover costs incurred for developing and marketing these products or services. As a result, our future results of operations and growth strategies could be materially and adversely affected. If we are unable to successfully implement our growth strategies, our revenue and profitability may not grow as expected, and our competitiveness may be materially and adversely affected.[11]

45.     The foregoing disclosures concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading at the time they were made because, as stated above, Defendants knew, recklessly disregarded, or were negligent in not knowing that the Company's launch of Cookie Run was delayed by stalled negotiations with

---

[11]Registration Statement at 23; Prospectus at 23.

Devsisters for the game, a delay in the Company's receipt of the source codes, and an extension of the testing period.  Yet Defendants omitted from the Registration Statement and Prospectus any mention of the risk that a delay in obtaining the source code from a game developer may require the Company to extend its scheduled testing period and delay its launch of a game for the Chinese domestic market.  Further, Defendants knew, recklessly disregarded, or were negligent in not knowing that they omitted from the Registration Statement and Prospectus the risk that such a delayed launch of a game such as Cookie Run may cause, and already had caused, material harm to the Company's business, in terms of its lost revenues and wasted development costs.

46.    The Registration Statement and Prospectus also omit a general risk disclosure regarding known trends and uncertainties relating to delays in the launch of casual games resulting from untimely receipt of source code, stalled negotiations with game developers, foreign and domestic, and extended testing periods.  Since its negotiations with Devsisters had stalled by the time of the filing of the Registration Statement and Prospectus, Defendants knew, recklessly disregarded, or were negligent in not knowing that the Company had received, or would receive, the Cookie Run source codes later than anticipated, in turn resulting in an extension of the testing period.  Thus, the risks that (a) the Company would not be able to launch Cookie Run to the Chinese domestic market consistent with its forecast, and (b) the Company's financial performance would be adversely affected, were no longer hypothetical.  These risks had materialized, and Defendants were duty bound, but failed, to disclose the specific risks to the Company's financial condition.

47.    Also in the Registration Statement and Prospectus, the Company included a section entitled "Significant Factors Affecting Our Results of Operations."  That section stated, in relevant part:

*Costs of our payment channels.* Our payment channel providers include China's three mobile carriers, namely China Mobile, China Unicom and China Telecom, and third-party payment platforms such as Alipay, Weixin Payments, China UnionPay and Yeepay. The mobile carriers and third-party payment platforms are generally entitled to a prescribed percentage of the gross billings, which is charged by the mobile carriers or third-party payment platforms to the mobile game players. We rely in part on these three mobile carriers as our payment processing and distribution channels. These mobile carriers account for a majority of our payment processing costs due to that most of our casual game purchases are paid through SMS billings, where mobile carrier charges the payment directly to users' mobile phone bills or deduct the amount directly from the users' remaining mobile balance. The percentage of payment processing fees charged by mobile carriers are relatively higher than those charged by third-party payment platforms. Additionally, due to their dominant position in China's telecommunications industry, our ability to negotiate more favorable terms with mobile carriers is limited. Our relationships with and ability to negotiate favorable terms with these mobile carriers and third-party payment channels directly affect our costs and profitability.[12]

48.    With respect to billing issues, the Registration Statement and Prospectus include

the following risk disclosure:

*Our ability to monetize our users is subject to third-party payment processing-related risks.*

We offer our users a variety of payment options, including direct billing through mobile carriers and other third-party online payment platforms. Therefore, we rely on them to provide payment processing services to our users, which subjects us to fraud and other illegal activities in connection with these various payment methods. We generally receive casual game gross billings through the mobile carriers and our mid- and hardcore game gross billings through a few third-party payment channels. The concentration of our payment channels could lead to a short-term disruption in our collection of the gross billings if one or more of them were to narrow or terminate its business cooperation with us, or demand commercial terms that are less favorable to us. Such concentration also makes us more vulnerable to collection risks should one or more of these providers become unable or unwilling to share the proceeds it receives with us. Our operations and business could be harmed if our relationships with one or more of these payment platforms

---

[12] Registration Statement at 84; Prospectus at 84.

deteriorate, or if one or more of the key payment platforms experience a decrease in their business generally or an increase in non-payment from users.

Furthermore, mobile carriers and third-party payment service providers are entitled to a prescribed percentage of the gross billings charged to our users. If these platforms fail to remit to us the proceeds collected from our user in a timely fashion or at all, if these platforms become unwilling or unable to provide these services to us, or if their service quality deteriorates, our business could be disrupted. Our payment platform partners are also subject to various rules, regulations and requirements, regulatory or otherwise, governing electronic funds transfers and virtual currencies, which could change or be reinterpreted to make it difficult or impossible for them to comply. If our payment partners fail to comply with these rules or requirements, they may be subject to fines and higher transaction fees and lose their ability to accept credit and debit card payments, process electronic funds transfers or facilitate other types of online payments from our users. This would materially and adversely affect our ability to monetize our users.[13]

49.    The statements in the foregoing two paragraphs from the Registration Statement and Prospectus were false and misleading because, as described above in paragraph 41, Defendants omitted the existence of, and risks related to, ongoing billing code issues with third party telecom carriers that led directly to the Company's inability to monetize fully its casual games.  The Company and the Officer Defendants knew or recklessly disregarded the existence of the ongoing billing code issues and the risks they posed to the Company's ability to monetize fully its casual games.

50.    On November 25, 2014, the Company filed with the SEC a Form 6-K (the "November 25, 2014 Form 6-K"),[14] attaching a press release (the "November 25 Press Release") as an exhibit.  In the November 25 Press Release, the Company stated, in relevant part: "For the fourth quarter of 2014, the Company expects revenue of RMB390 million (US$63.2 million) to

---

[13] Registration Statement at 21; Prospectus at 21.
[14] The November 25, 2014 Form 6-K was signed by Defendant Zou.

RMB410 million (US$66.5 million), which represents year-over-year growth of 243.4% to 261.1%. This forecast is based on the Company's current view on its recent operational results, estimated performance of its games and general market conditions, which may fluctuate and are subject to change." November 25, 2014 Form 6-K, Ex. 99.1 at 6.

51.     Near the end of the November 25 Press Release, the Company provided the following statement:

> **Safe Harbor Statements**
> All statements other than statements of historical fact contained in this release, including statements regarding future results of the operations of the Company are forward-looking statements, which are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to a number of risks, uncertainties and assumptions that could cause actual results to differ materially. Factors that might cause or contribute to such differences include, but are not limited to: the Company's ability to effectively acquire, retain and monetize users; the fact that a relatively small number of games continue to account for a substantial majority of the Company's revenue, and declines in popularity of these games could harm its financial results; the Company's ability to extend the life cycle of its existing popular games and to source and launch new popular games in a timely manner; the fact that revenues from new games may not be sufficient to offset declines in revenues in more mature games; market acceptance of new games and enhancements to existing games; the Company's relationship with developers of popular games and its ability to enter into favorable revenue sharing arrangements with the developers; the Company's relationship with China's major mobile game distribution and payment processing platforms; the continued growth of the Company's proprietary distribution channel and the effectiveness of cross-promotion on its platform; intense competition in the mobile game industry; the Company's relatively short operating history; the price of the Company's ADSs and changing market conditions for its ADSs; general economic conditions and their impact on consumer spending, especially leisure spending; acquisition-related risks, including unknown liabilities and integration risks; as well as those risks detailed from time to time under the caption "Risk Factors" and elsewhere in the Company's Securities and Exchange Commission filings and reports, including in the prospectus filed by the Company on August 7, 2014. In addition, the Company operates

in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for the management to predict all risks, nor can the Company assess the impact of all factors on its business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements that the Company may make. In light of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this release are inherently uncertain and may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Accordingly, you should not rely upon forward-looking statements as predictions of future events. The Company does not undertake any obligation to update publicly or revise any forward-looking statements for any reason after the date of this release, nor to conform these statements to actual results, future events, or to changes in the Company's expectations.[15]

52.     The foregoing statements were false and misleading. The Company and the Officer Defendants knew that the November 25 revenue guidance incorporated material revenues from Cookie Run for the remainder of the fourth quarter of 2014 – a five week period.  As the Officer Defendants later admitted in the March 23 Call, as detailed below, they knew that their fourth quarter 2014 forecast incorporated projected revenues for Cookie Run.  As of November 25, 2014, however, Defendants knew that, due to the delayed testing period, the Company would not launch Cookie Run in 2014.   Further, the Company and the Officer Defendants knew that only approximately five weeks were left in the fourth quarter of 2014, and that, based on the Company's statement in the March 23 Call that Cookie Run's expected release was expected sometime "in 2015," Cookie Run had not produced and would not produce any revenue for the Company as of November 25, 2014.

53.     Despite Defendants' knowledge of the facts set forth above, they failed to disclose them to investors during the November 25 Press Release.  As a result of the false and misleading

---

[15] November 25, 2014 Form 6-K, Ex. 99.1 at 8.

revenue projections for the fourth quarter of 2014, investors remained unaware of the material

negative information awaiting them in March, 2015.

**THE TRUTH EMERGES**

54.     On March 13, 2015, after the market closed, the Company issued a press release

entitled, "IDS Announces Updates to Fourth Quarter 2014 Guidance and US$20 Million Share

Repurchase Program."  The March 13, 2015 press release was attached to the Company's Form 6-

K, which was filed with the SEC on March 16, 2015 (the "March 16, 2015 Form 6-K").  In the

press release, the Company, in relevant part, stated as follows:

> IDS Technology Limited ("IDS" or the "Company") (Nasdaq:
> DSKY), China's leading independent mobile game publishing
> platform, today announced updates to its previous revenue guidance
> for the fourth quarter of 2014 and a share repurchase program
> approved by the board of directors of the Company.
>
> The Company estimates its revenue guidance for the fourth quarter
> of 2014 to be between RMB327.0 million (US$52.7 million) and
> RMB329.0 million (US$53.0 million), as compared to the
> previously announced revenue guidance of between RMB390.0
> million (US$62.9 million) and RMB410.0 million (US$66.l
> million). This revised guidance represents an increase of between
> 189% and 191% on a year-over-year basis. ***The Company has
> revised its guidance mainly because, in the fourth quarter of 2014,
> the launch of a popular casual game was delayed on one of the
> Company distribution platforms***, and the monetization of another
> popular casual game was less than expected due to the simultaneous
> launch of other hit games on the same distribution platform.
>
> In addition, for the fourth quarter of 2014, the Company currently
> estimates that net income will be between RMB28.0 million
> (US$4.5 million) and RMB30.0 million (US$4.8 million),
> representing an increase of between 70% and 82% on a year-over-
> year basis. Non-GAAP adjusted net income2 will be between
> RMB49.0 million (US$7.9 million) to RMB51.0 million (US$8.2
> million), representing an increase of between 195% and 207% on a
> year-over-year basis.

As these selected estimated results are subject to the finalization of the Company's financial closing procedures, the Company's actual results may differ from its current estimates.[16]  (Emphasis added).

55.     On this news, ADSs of IDS declined $3.60 per share, over 33%, to close on March 16, 2015, the next trading day, at $7.22 per share, on unusually heavy volume.

56.     On March 23, 2015, the Company issued a press release announcing fourth quarter and full year 2014 earnings.  In the press release, "[t]he Company's revenue for the fourth quarter of 2014 was also negatively impacted as a result of a delay in the launch of Cookie Run due to that the Company received the source code of the game later than scheduled and the testing period by the distribution platform was extended."  The Company further provided that Cookie Run was among the "games in the pipeline for the first half of 2015."

57.     On March 23, 2015, the Company held an earnings conference call for investors to discuss its fourth quarter and full year 2014 earnings.  During the call, the Company and the Officer Defendants stated that there were "three key reasons" for the "shortfall on guidance."  As a reason for that shortfall, the Officer Defendants cited that "the launch of Cookie Run was delayed due to the company receiving the source code of the game later than scheduled and the testing period by the distribution platform was extended."  The Company and the Officer Defendants stated that it expected to launch the game "in 2015."

58.     Former employees of IDS confirm that delays associated with the Company's late receipt of Cookie Run source codes would have had negative financial consequences for the Company.  FE1 recalls that the failure to release an important game such as Cookie Run in a timely manner would have a detrimental effect upon the Company's market performance and net

---

[16] March 16, 2015 Form 6-K, Ex. 99.1 at 1-2.

revenues.  FE2 estimated that the delay at issue here may have resulted in losses of US$4 million to US$5 million for the Company, consisting of lost purchases and general operational costs.

59.     In addition, in the March 23 Call, Defendant Ko disclosed ongoing problems relating to the Company's inability to monetize fully certain of its casual games "due to the third party telecom carrier billing code issue."  Defendant Ko continued: "The Company has started to gradually replace those third-party billing codes with its own building code. This will give the Company better control over production and recording of actual gross billing generated in these games."

60.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired IDS ADSs: (l) pursuant and/or traceable to the Company's Registration Statement and/or Prospectus issued in connection with the Company's IPO on or about August 7, 2014, seeking to pursue remedies under the Securities Act; and/or (2) on the open market between November 25, 2014 and March 13, 2015, inclusive, seeking to pursue remedies under the Exchange Act; and were damaged thereby (collectively, the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

62.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IDS's securities were actively traded on the Nasdaq Global Market (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of IDS shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by IDS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by  Defendants'  acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of IDS; and

(c)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

67.      Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

68.      During the Class Period, Plaintiffs and the Class purchased IDS's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

69.      As alleged herein with respect to the Exchange Act, the Company and the Officer Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Officer

Defendants, by virtue of their receipt of information reflecting the true facts regarding IDS, his/her control over, and/or receipt and/or modification of IDS's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning IDS, participated in the fraudulent scheme alleged herein.

**APPLICATION OF PRESUMPTION**
**OF RELIANCE: FRAUD ON THE MARKET**

70.     The market for IDS's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, IDS's securities traded at artificially inflated prices during the Class Period. On November 28, 2014, the Company's stock closed at a Class Period high of $21.24 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of IDS's securities and market information relating to IDS, and have been damaged thereby.

71.     During the Class Period, the artificial inflation of IDS's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about IDS's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of IDS and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and

other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

72.     For the relevant Securities Exchange Act claims, Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine.  At all relevant times, the market for the Company's ADSs was efficient for the following reasons, among others:

a.     For most of the Class Period, the ADSs stock traded on the NASDAQ Global Market;

b.     As a regulated issuer, IDS filed annual reports and quarterly press releases with the SEC;

c.     The Company regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

d.     During the Class Period, the average daily trading volume in the Company's ADSs was 519,801 ADS or weekly average trading volume of approximately 544,975 ADSs.  As of August 7, 2015, the Company had approximately 8,855,000 ADSs issued and outstanding, meaning that 6.2% of the float trading weekly, establishing a strong presumption that the market for its stock was;

e.     New company specific information was rapidly reflected in the Company's stock price; and

f.     IDS was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales

force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for the Company's ADSs promptly digested current information regarding IDS from all publicly available sources and reflected such information in the Company's ADS price.  Under these circumstances, all purchasers of the ADS's during the Class Period suffered similar injury through their purchase of the ADSs at artificially inflated prices, and a presumption of reliance applies. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

74.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **NO SAFE HARBOR**

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of IDS who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 11 of the Securities Act**
**Against the Company, the Officer Defendants, and the Director Defendants**

76.     Plaintiffs repeat and reallege each and every allegation set forth above, except any allegation of fraud, recklessness or intentional misconduct.

77.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Company, the Officer Defendants, and the Director Defendants and is pleaded as a claim in negligence and not in fraud.

78.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

79.     IDS is the registrant for the IPO.  The Officer Defendants and the Director Defendants were responsible for the contents and dissemination of the Registration Statement and, in fact, signed the Registration Statement.

80.     As issuer of the shares, IDS is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

81.     None of the relevant Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

82.     By reasons of the conduct herein alleged, the Company, the Officer Defendants, and the Director Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

83.     Plaintiffs acquired IDS shares pursuant and/or traceable to the Registration Statement for the IPO.

84.     Plaintiffs and the Class have sustained damages. The value of the Company's ADSs has declined substantially subsequent to and due to the violations by the Company, the Officer Defendants, and the Director Defendants.

**SECOND CLAIM**
**Violation of Section 12(a)(1) of the Securities Act**
**Against the Company and the Underwriters Defendants**

85.     Plaintiffs repeat and reallege each and every allegation set forth above, except any allegation of fraud, recklessness or intentional misconduct.

86.     This Count is brought pursuant to § 12(a)(1) of the Securities Act on behalf of all persons or entities who purchased IDS ADSs pursuant to the Registration Statement and/or Prospectus.  Plaintiffs do not assert that the Company and the Underwriter Defendants named in this Count are liable for fraudulent or intentional conduct.

87.     The Company and the Underwriter Defendants were sellers and/or offerors of a security, specifically the IDS ADSs.

88.     By means of the Registration Statement and/or Prospectus, the Company and the Underwriter Defendants offered ADSs of the Company to the Class in return for $15.00 each.  The Company's and the Underwriter Defendants' actions of solicitation consisted of the preparation and/or dissemination of the Registration Statement and/or Prospectus and/or the solicitation of the Class.

33

89.     The IDS ADSs were sold through the use of interstate communication, the use of interstate commerce, and the use of the mails.

90.     The IDS ADSs were sold through the use of the Registration Statement and/or Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not materially misleading.

91.     The Company and the Underwriter Defendants cannot prove that they did not know, or in the exercise of reasonable care, could not have known, of the untruth or omission described in the preceding paragraph.

92.     By reason of the conduct alleged herein, the Company and the Underwriter Defendants violated § 12(a)(1) of the Securities Act.  As a direct and proximate result of the Company's and the Underwriter Defendants' conduct, Plaintiffs and other members of the Class who purchased IDS ADSs pursuant to the Registration Statement and/or Prospectus and traceable thereto have suffered substantial damage.  Accordingly, Plaintiffs and the other members of the Class were harmed, and seek damages and/or rescission of the IPO.

### THIRD CLAIM
### Violation of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

93.     Plaintiffs repeat and reallege each and every allegation set forth above, except any allegation of fraud, recklessness or intentional misconduct.

94.     This Count is brought pursuant to § 12(a)(2) of the Securities Act on behalf of all persons or entities who purchased IDS ADSs pursuant to the Registration Statement and/or Prospectus.  Plaintiffs do not assert that the Underwriter Defendants named in this Count are liable for fraudulent or intentional conduct.

95.     The Underwriter Defendants were sellers of a security, specifically the IDS ADSs.

96.     By means of the Registration Statement and/or Prospectus, the Underwriter Defendants offered ADSs of the Company to the Class in return for $15.00 each.  The Underwriter Defendants' actions of solicitation consisted primarily of the preparation and/or dissemination of the Registration Statement and/or Prospectus.

97.     The Underwriter Defendants sold the Company ADSs through the use of interstate communication, the use of interstate commerce, and the use of the mails, including the use of a Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

98.     The Underwriter Defendants cannot prove that they did not know, or in the exercise of reasonable care, could not have known, of the untruth or omission described in the preceding paragraph.

99.     By reason of the conduct alleged herein, the Underwriter Defendants violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of the Underwriter Defendants' conduct, Plaintiffs and other members of the Class who purchased the Company ADSs pursuant to the Registration Statement and/or Prospectus and traceable thereto have suffered substantial damage.  Accordingly, Plaintiffs and the other members of the Class were harmed, and seek damages and/or rescission of the IPO.

### FOURTH CLAIM
### Violation of Section 15 of the Securities Act
### Against the Officer Defendants and the Director Defendants

100.    Plaintiffs repeat and reallege each and every allegation set forth above, except any allegation of fraud, recklessness or intentional misconduct.

101.    This count is asserted against the Officer Defendants and the Director Defendants and is based upon Section 15 of the Securities Act and is pleaded as a claim in negligence and not in fraud.

102.    The Officer Defendants and the Director Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of IDS within the meaning of Section 15 of the Securities Act. The Officer Defendants and the Director Defendants had the power and influence and exercised the same to cause IDS to engage in the acts described herein.

103.    The Officer Defendants' and the Director Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

104.    By virtue of the conduct alleged herein, the Officer Defendants and the Director Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

### FIFTH CLAIM
### Violation of Section 10(b) of the
### Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against the Company and Officer Defendants

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    During the Class Period, the Company and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase IDS's securities at artificially

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

107.    The Company and the Officer Defendants (i) employed devices, schemes. and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for IDS's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Plaintiffs sue the Officer Defendants either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as al1eged below.

108.    The Company and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about IDS's financial well-being and prospects, as specified herein.

109.    The Company and the Officer Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IDS's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary to make the statements made about IDS and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

110.    Each of the Officer Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Officer Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Officer Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Officer Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

111.    The Company and the Officer Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IDS's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects during the Class Period, the Company and the Officer Defendants, if they did not have actual knowledge of the

misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

112.    The Company's and the Officer Defendants' dissemination of the materially false and/or misleading information and/or their failure to disclose material facts, as set forth above, artificially inflated the market price of IDS's securities during the Class Period.  In ignorance of the fact that market prices of the Company's ADS prices were artificially inflated, and relying directly or indirectly on the Company's and the Officer Defendants' false and misleading statements, or upon the integrity of the market in which the Company's ADSs trades, and/or in the absence of material adverse information that the Company and the Officer Defendants knew or recklessly disregarded, but failed to disclose publicly during the Class Period, Plaintiffs and the other members of the Class acquired  IDS's securities during the Class Period at artificially high prices and were damaged thereby.

113.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the risks relating to the Company's receiving source codes to launch games and about Cookie Run, in particular, that the Company and the Officer Defendants withheld, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their IDS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

114.    By virtue of the foregoing, the Company and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

115.     As a direct and proximate result of the Company's and the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SIXTH CLAIM
### Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants

116.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

117.     The Officer Defendants acted as controlling persons of IDS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

118.     In particular, each of the Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

119.    As set forth above, IDS and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

120.    As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 25, 2016                    Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence Rosen
Philip Kim
275 Madison Avenue, 34th Floor
New York, NY  10016
T: (212) 686-1060
F: (212) 202-3827
Email: lrosen@rosenlegal.com
         pkim@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Jacob Goldberg
Keith R. Lorenze
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
T: (215) 600-2817
F: (212) 202-3827
Email: jgoldberg@rosenlegal.com
         klorenze@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiff and the Class*

**GLANCY PRONGAY & MURRAY LLP**

Joshua L. Crowell
Elaine Chang
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 432-1495
Email: jcrowell@glancylaw.com
         echang@glancylaw.com

*Co-Lead Counsel for Lead Plaintiff and the Class*

**WEISSLAW, LLP**
Joseph H. Weiss
Mark D. Smilow
1500 Broadway
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

*Additional Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 25, 2016, I electronically filed the foregoing *Consolidated Amended Class Action Complaint* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence Rosen*
Laurence Rosen
275 Madison Avenue, 34th Floor
New York, NY  10016
T: (212) 686-1060
F: (212) 202-3827
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs and the Class*

44